1
2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4   FRANCISCO VALDEZ, et al.,              No. C 09-0176 CW

5          Plaintiffs,                     ORDER DENYING
                                           MOTION FOR CLASS
6      v.                                  CERTIFICATION
                                           (Docket No. 118);
7   CITY OF SAN JOSE, et al.,              GRANTING IN PART
                                           AND DENYING IN
8          Defendants.                     PART MOTION FOR
    _____/   SUMMARY JUDGMENT
9                                          (Docket No. 127)

10

11        Plaintiffs Francisco Valdez, Ricardo Vasquez, Daniel

12   Martinez, and Jamil Stubbs bring this action against the City of

13   San Jose, San Jose Police Chief Robert Davis, and San Jose Police

14   Officers R. Agamau, Martin, Rickert, Wallace, and Orlando.[1]

     Plaintiffs now move for class certification.  Defendants oppose
15
     the motion and move for summary judgment.  Plaintiffs oppose the
16
     motion for summary judgment.  Having considered the parties'
17
     papers and oral argument, the Court denies Plaintiffs' motion for
18
     class certification and grants in part and denies in part
19
     Defendants' motion for summary judgment.
20
                              BACKGROUND
21
          All four Plaintiffs were arrested for violating section
22
23   647(f) of the California Penal Code, also known as California's

24

25        [1] Agamau is named in the operative complaint as "R. Agaman"
26   but indicates in his declaration that his true name is Agamau.
     Declaration of Ryan Amagau ¶ 1.  Plaintiffs also seem to address
27   claims against two other officers, Michael Panighetti and Gustavo
     Perez, neither of whom were named as defendants in the operative
28   complaint.

United States District Court
For the Northern District of California

public intoxication law.  Under that provision, a person is guilty of disorderly conduct, a misdemeanor, if he or she

> is found in any public place under the influence of intoxicating liquor, any drug, controlled substance, toluene, or any combination of any intoxicating liquor, drug, controlled substance, or toluene, in a condition that he or she is unable to exercise care for his or her own safety or the safety of others, or by reason of his or her [intoxication], interferes with or obstructs or prevents the free use of any street, sidewalk, or other public way.

Cal. Penal Code § 647(f).

Plaintiffs, all of whom are either African-American or Latino,[2] were arrested by the San Jose Police Department (SJPD) in downtown San Jose between 2007 and 2008.  The following sections describe their arrests in greater detail.

A.   Plaintiff Martinez's Arrest

On the evening of February 1, 2007, Martinez went to a nightclub in downtown San Jose with his friend, Shana Stewart, and his cousin.  Declaration of M. Jeffrey Kallis, Ex. B, Deposition of D. Martinez, at 19:21-20:2; Declaration of Shana Stewart ¶ 2.  About an hour after they arrived, a group of women assaulted Stewart and stole her purse while she was waiting in line for the bathroom.  Stewart Decl. ¶ 3; Martinez Depo. 44:21-:23.  Although Martinez and his cousin did not see the incident, Stewart told them about it immediately afterward and described her assailants to them.  Stewart Decl. ¶¶ 3-4, 7; Declaration of Daniel Martinez ¶ 4, Ex. A, at 1.

---

[2] All Plaintiffs identify as Latino, except Plaintiff Stubbs, who identifies as African-American.

**United States District Court**
For the Northern District of California

A short while later, Martinez saw a security guard in front of the nightclub speaking to a woman who resembled one of Stewart's attackers. Martinez Decl., Ex. A, at 1; Martinez Depo. 45:3-:6; Stewart Decl. ¶ 7. He approached the woman and asked her to go speak with the police, who had just arrived at the nightclub a few minutes earlier. Martinez Depo. 43:23-44:4. The woman refused and began to flee. Id. 62:6-:15. Martinez then tried to tell one of the SJPD officers at the scene that the woman was getting away but the officer ignored him. Id. 61:23-62:17. Instead of pursuing the woman, the officer, who was speaking to Stewart at the time, told Martinez to leave them alone. Id. 62:12-:17.

Martinez then approached another officer to report that Stewart's attacker was fleeing. Id. 63:5-:14. According to Martinez, the officer responded by asking Martinez to step toward the curb. Id. 65:19-:24; Martinez Decl., Ex. A, at 1. Disappointed that the officer refused to pursue Stewart's attacker, Martinez called the officer an "asshole"; he states, however, that despite his frustration, he still complied with the officer's instructions to walk towards the curb. Martinez Depo. 61:18-:22, 73:3-:15. At that moment, as he began walking toward the curb, Martinez claims that the officer "grabbed [his] right hand and twisted it behind [his] back." Id. 73:1-:15. The officer then placed him under arrest and put him inside a police van. Martinez Decl. ¶ 2, Ex. A, at 2. When Martinez asked the officer why he was being arrested, the officer told him that it was because he was drunk. Id., Ex A, at 2; Martinez Depo. 73:3-:15. Martinez admits that he had a rum-and-coke and part of

United States District Court
For the Northern District of California

a beer earlier in the night but denies that he was drunk when he was arrested.  Martinez Depo. 29:18-:20, 55:4-:8; Martinez Decl., Ex. A, at 2.

Officer Wallace, who made the arrest, disputes this account and states that Martinez appeared "very drunk" to him. Declaration of Martin Wallace ¶ 8.  He asserts that Martinez had bloodshot eyes, an unsteady gait, and emitted "a strong odor of alcohol."  Id. ¶ 8.  Wallace also asserts that Martinez had been wandering around in the street prior to his arrest and harassing various officers.  Id. ¶ 7.  Based on these observations, Wallace believed that "Martinez was unable to care for his safety" and decided to arrest him under section 647(f).  Id.  Wallace, who is African-American, asserts that he "gave no consideration to the fact that Mr. Martinez is Hispanic in making the decision to arrest him."  Id. ¶ 10.

Stewart, who is white, was arrested by another SJPD officer, Officer Martin, shortly thereafter.  Stewart Decl. ¶¶ 12-13.  She asserts that she, too, was sober at the time of her arrest.  Id. ¶ 10.

B.   Plaintiffs Valdez and Vasquez's Arrests

On June 27, 2008, Valdez and Vasquez drove together from Freedom, California, where they reside, to San Jose.  Kallis Decl., Ex. D, Deposition of R. Vasquez, at 9:2-:14.  They arrived in the early evening and parked at a downtown 7-Eleven on Santa Clara Street.  Id., Ex. C, Deposition of F. Valdez, at 14:1-:8. After spending a "few hours" in the downtown area, the two returned to the 7-Eleven to drive back to Freedom.  Id. 15:25-16:4; Vasquez Depo. 8:17-:20.  Neither recalls exactly where

United States District Court
For the Northern District of California

they went or how long they spent in the downtown area but both assert that they did not purchase any alcohol while they were there.  Valdez Depo. 16:5-:9; Vasquez Depo. 11:7-:12, 12:3-:5, 23:4-:10.

When they returned to the truck that evening, Vasquez entered the 7-Eleven to buy some snacks and non-alcoholic beverages for the drive home.  Vasquez Depo. 16:18-:22.  Valdez waited for him in the parking lot near the truck.  Id. 16:6-:17; Valdez Depo. 20:2-:13.  According to Valdez, several SJPD officers -- he does not recall the exact number -- approached him while he was standing in the parking lot and began questioning him about why he was there.  Valdez Depo. 20:11-:20, 23:2-:4, 23:15-:19.  When he replied that he was waiting for his friend, one of the officers went inside the store to find Vasquez.  Id.  Valdez asserts that while he was speaking to the officers in the parking lot, one of them told him, "We don't want your kind here."  Id. 24:6-:8.

Meanwhile, the officer who went into the 7-Eleven quickly found Vasquez and escorted him towards the parking lot with the other officers.  Vasquez Depo. 16:18-:25.  Vasquez testified at his deposition that the officer grabbed his hand and twisted it as they left the store.  Id. 17:1-:7.  He also testified that the officers refused to respond to him and Valdez when they asked why they were being questioned.  Id. 17:16-:20, 18:19-19:8.

Once Valdez and Vasquez were both in the parking lot, the police zip-tied their hands, placed them under arrest, and put them in a police van.  Vasquez Depo. 18:19-19:5; Valdez Depo. 24:2-:14.  The two were then detained in police custody until early the next morning.  Valdez Depo. 24:24-:25; Vasquez Depo.

29:5-:6.  Although Valdez admits to having consumed some whiskey that he brought from Freedom earlier in the evening, both he and Vasquez assert that they were not intoxicated when they were arrested.  Valdez Depo. 17:11-:20, 36:11-37:1; Vasquez Depo. 26:13-:18, 35:22-:23.

The SJPD officers who arrested Valdez and Vasquez dispute their claims of sobriety.  In a report detailing the circumstances of Vasquez's arrest, Officer Panighetti states that Vasquez had "red blood shot watery eyes, slurred speech, [and] staggered gait."  Declaration of Michael Panighetti ¶ 5, Ex. B, at 2. Officer Amagau's report, which documents the circumstances of Valdez's arrest, similarly states that Valdez had "bloodshot eyes, staggering gait, [and] slurred speech."  Kallis Decl., Ex. J, Pre-Booking Information Sheet for F. Valdez.  It also states that Valdez was "in the middle of 10th [Street] . . . walking in circles" when Amagau first encountered him.  Id.  The officers assert that they arrested Vasquez and Valdez for public intoxication based on their observations of the pair's behavior at the 7-Eleven that night.  Panighetti Decl. ¶ 6; Amagau Decl. ¶¶ 7-8.  The officers also assert that the arrests were based solely on these observations and not on Valdez or Vasquez's race or ethnicity.  Panighetti Decl. ¶ 6; Amagau Decl. ¶ 8.

C.   Plaintiff Stubbs' Arrest

On September 6, 2008, Stubbs and his friend, Leon Shirley, drove together from Newark, California, to San Jose to attend a couple of live musical performances.  Kallis Decl., Ex. A, Deposition of J. Stubbs, at 16:1-:9.  They parked in a public garage on Third Street at about 9:00 p.m.  Id. 19:2-:10;

United States District Court
For the Northern District of California

Declaration of Leon Shirley ¶ 3.  After attending a couple of performances at two downtown nightclubs, Stubbs and Shirley walked back to the garage at around 1:00 a.m. to drive back to Newark. Stubbs Depo. 27:20-28:3; Shirley Decl. ¶ 4.

When they returned to the garage, they encountered two SJPD officers near Shirley's car.  Shirley Decl. ¶ 8; Stubbs Depo. 32:6-:8.  According to Stubbs, one of the officers approached him as Stubbs was putting out a cigarette beside the car; the other officer approached Shirley.  Stubbs Depo. 28:11-:14, 29:15-:19, 32:6-:21.  Stubbs testified at his deposition that, although he could not hear exactly what Shirley was saying to the officer, it sounded like Shirley "was getting smart" with him.  Id. 32:18-:21. While Shirley was speaking to that officer, the other officer "pulled [Stubbs] to the side" and accused him of urinating on the wall of the parking garage, a charge that Stubbs immediately denied.  Id. 36:5-:17.  After some further discussion, the officers placed both Shirley, who is white, and Stubbs under arrest.  Id. 32:11-:12; Shirley Decl. ¶¶ 9-10.  Although Stubbs admits that he had a few drinks at a nightclub earlier in the evening, both he and Shirley assert that he was not exhibiting any signs of intoxication or defiance when they were arrested.[3] Stubbs Depo. 57:16-58:9; Shirley Decl. ¶ 11.

Officer Orlando, who arrested Stubbs, disputes these claims. He states in his declaration that Stubbs first caught his attention "because he was urinating on the wall in the garage."

---

[3] Although Shirley is not a plaintiff in this lawsuit, he asserts that he, too, was sober when he was arrested.  Shirley Decl. ¶ 5 ("During the entire time in San Jose that night, I did not consume any alcohol.").

Declaration of Brandon Orlando ¶ 5.  Orlando further asserts that Stubbs' "eyes were bloodshot," his breath smelled of alcohol, and "he was verbally combative and would not listen to commands."  Id. ¶ 6.  According to Orlando's police report, he decided to arrest Stubbs for public intoxication based on these observations. Kallis Decl., Ex. J., Pre-Booking Information Sheet for J. Stubbs. Orlando asserts that neither he nor Officer Perez, who arrested Shirley, based their decisions on Stubbs' or Shirley's race. Orlando Decl. ¶ 9.

D.   Procedural Background

Plaintiffs filed this putative class action lawsuit against the City of San Jose and several SJPD officers on January 14, 2009.  Docket No. 1.  They filed a second amended complaint (2AC) on July 14, 2009.  Docket No. 27.[4]  In their 2AC, they assert sixteen causes of action: (1) a claim under 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978), against the City based on an alleged policy, custom and long-standing practice of wrongfully arresting individuals for violations of Penal Code section 647(f), infringing on Plaintiffs'

---

[4] Plaintiffs apparently intended to amend the 2AC to add Panighetti and Perez as defendants but, to date, have not actually done so.  On November 19, 2009, they filed a document entitled, "Amendment to Complaint to Identify Does by True Names and Capacities."  Docket No. 30.  Plaintiffs filed that document without obtaining leave to amend the complaint or a stipulation from Defendants permitting such an amendment.  The document did not include a copy of the proposed third amended complaint, as required by the local rules, Civil L.R. 10-1 ("Any party filing or moving to file an amended pleading must reproduce the entire proposed pleading and may not incorporate any part of a prior pleading by reference."), nor was it served on Panighetti and Perez.  Accordingly, the Court treats Plaintiffs' 2AC as the operative complaint.

United States District Court
For the Northern District of California

First, Fifth, Sixth, Eighth, and Fourteenth Amendment rights;
(2) a Monell claim under § 1983 against Chief Davis based on his
actions as a final policy maker; (3) a Monell claim under § 1983
against Chief Davis based on his actions ratifying police
misconduct; (4) a Monell claim under § 1983 against the City for
failure to train police officers as to the rights secured by the
First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments;
(5) a claim under § 1983 against Chief Davis for "supervisory
liability based on the misconduct of subordinates"; (6) a claim
under § 1983 against Agamau, Martin, Rickert, Wallace and Orlando
for falsely detaining, arresting, and incarcerating Plaintiffs in
violation of their First and Fourth Amendment rights, as well as
depriving them of their Fifth, Sixth, and Eighth Amendment rights
and enforcing section 647(f) in a discriminatory manner in
violation of the Fourteenth Amendment; (7) a claim against all
Defendants for conspiracy under 42 U.S.C. § 1985; (8) a claim for
false arrest against Agamau, Martin, Rickert, Wallace and Orlando;
(9) a claim for false imprisonment against the same officers;
(10) a claim for battery against the same; (11) a claim against
all Defendants for violation of the Ralph Act, California Civil
Code section 51.7; (12) a claim against all Defendants for
violation of the Bane Act, California Civil Code section 52.1(b);
(13) a claim against all Defendants for civil conspiracy to
violate civil rights and commit torts; (14) a claim against all
Defendants for aiding and abetting civil rights violations and the
commission of torts; (15) a claim for negligence against all
Defendants; and (16) a claim for injunctive relief against all
Defendants.

On May 29, 2012, Plaintiffs moved to certify a class consisting of

> [a]ll individuals who between January 14, 2006 and the present were arrested for violation of section 647(f) where the Affidavit of Probable Cause fails to present objective facts, other than the four subjective symptoms, sufficient to demonstrate a violation of Penal Code § 647(f).

Pls.' Mot. Class Cert. 5.  They also seek to certify a subclass defined as

> [a]ll racial minorities who between January 14, 2006 and the present were subjected to unequal and discriminatory enforcement of Penal Code 647(f) based upon their race as demonstrated in Penal Code § 647(f) police paperwork and the statistical analysis.

Id. at 5-6.  Defendants filed an opposition and moved for summary judgment on June 8, 2012.

DISCUSSION

I.   Defendants' Motion for Summary Judgment

A.   Legal Standard

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences

in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or

**United States District Court**
For the Northern District of California

admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  <u>Nissan</u>, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u>  This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  <u>Id.</u> at 1107.

B.   Federal Claims against Defendants Wallace, Agamau, and Orlando

1.   Fourth Amendment Claims

The Fourth Amendment requires police officers to have probable cause before making a warrantless arrest.  <u>Ramirez v. City of Buena Park</u>, 560 F.3d 1012, 1023 (9th Cir. 2008) (citing <u>Michigan v. Summers</u>, 452 U.S. 692, 700 (1981)).  "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."  <u>United States v. Lopez</u>, 482 F.3d 1067, 1072 (9th Cir. 2007).

Defendants move for summary judgment on the grounds that the individual officers who arrested Plaintiffs had probable cause to believe that Plaintiffs had violated section 647(f).  Because

disputed issues of material fact remain with respect to each
Plaintiff's arrest, summary judgment must be denied.

                a.   Officer Wallace

Wallace and Martinez offer conflicting accounts of the events
surrounding Martinez's arrest.  Most significantly, they dispute
whether Martinez was drunk when he was arrested.  Martinez asserts
that he had less than two drinks on the evening of his arrest,
Martinez Depo. 29:18-:20, 55:4-:8, while Wallace asserts that he
appeared "very drunk" to him, Wallace Decl. ¶ 8.

In addition to disputing Martinez's sobriety, Martinez and
Wallace dispute whether Martinez defied Wallace's instructions
that night.  Wallace states in his declaration that he "asked Mr.
Martinez, more than once, to move to the sidewalk for his safety
but he did not."  Wallace Decl. ¶ 7.  During his deposition,
however, Martinez testified that he followed Wallace's
instructions to walk towards the curb.  Martinez Depo. 73:3-:6.

These factual disputes are central to the question of whether
or not Wallace had probable cause to arrest Martinez under section
647(f).  Accordingly, the Fourth Amendment claims against Wallace
cannot be resolved by summary judgment.

                b.   Officer Agamau

Amagau and Valdez dispute several relevant facts regarding
the circumstances of Valdez's arrest.  Agamau asserts in his
declaration that he found Valdez "walking in circles on 10th
Street."  Agamau Decl. ¶ 5.  Valdez, in contrast, during his
deposition expressly denied walking in the middle of the street.
Valdez Depo. 31:15-:25.  Agamau states that, when he encountered
Valdez that night, "it was readily apparent he was highly

**United States District Court**
For the Northern District of California

intoxicated." Agamau Decl. ¶ 6. Valdez, however, testified at his deposition that, other than the small bit of whiskey he had consumed a "few hours" earlier, he "wasn't drinking" on the night he was arrested. Valdez Depo. 15:25-16:9, 16:24-17:23, 36:11-37:1 (stating that at "the time I was arrested I know for myself I wasn't under the influence whatsoever"). Agamau asserts that Valdez was staggering unsteadily as he walked, Agamau Decl. ¶ 6; Valdez testified that he had no trouble walking and never felt dizzy or unsteady. Valdez Depo. 36:11-:19. These factual disputes are all material to whether Wallace had probable cause to arrest Valdez under section 647(f) and, thus, preclude summary judgment on this claim.

     c. Officer Orlando

  As with Valdez and Martinez, the circumstances surrounding Stubbs' arrest are disputed. Orlando states that he arrested Stubbs after witnessing him urinate on a parking garage wall. Orlando Decl. ¶¶ 5-6. He asserts that it was "evident that [Stubbs] was intoxicated" from his bloodshot eyes and the smell of alcohol on his breath. Id. ¶¶ 5-6. Orlando also states that Stubbs was "verbally combative" and defiant. Id. ¶ 6.

  This account contradicts that of Stubbs and his friend, Shirley. Shirley states in his declaration that he never saw Stubbs urinating in the garage nor did he see Stubbs "having difficulty walking, staggering, slurring his speech or otherwise acting drunk." Shirley Decl. ¶¶ 6-7. Stubbs himself testified at his deposition that he had consumed only a few drinks that night and was not exhibiting any signs of inebriation when he was arrested. Stubbs Depo. 24:4-:12, 57:16-58:9. He also testified

that he never urinated in the parking garage and that he complied with Orlando's commands prior to his arrest.  <u>Id.</u> 36:24-:25, 40:5-:11.  Based on these disputes of material fact, summary judgment must be denied.

> ### 2.   Fourteenth Amendment Claims

Plaintiffs allege that each of officers who arrested them did so with a racially discriminatory purpose in violation of the Fourteenth Amendment's equal protection clause.  Thus, to survive summary judgment on this claim, Plaintiffs must present evidence to support an inference that each officer's arrest decision was racially motivated.  <u>United States v. Armstrong</u>, 517 U.S. 456, 465 (1996).

The only evidence Plaintiffs offer of discriminatory intent here is the comment that Vasquez and Valdez heard Agamau make while they were being arrested.  Although neither remembers Agamau's exact words, both assert that they heard the comment.  Valdez testified at his deposition that the officer said something to the effect of "We don't want your kind here."  Valdez Depo. 26:6-:9.  Vasquez similarly testified that the officer said, "We don't want you guys to come back.  We don't like you people."  Vasquez Depo. 18:5-:6.

Defendants argue that, even if Valdez and Vasquez's allegations are true, an isolated comment like this is insufficient to establish discriminatory intent for the purposes of Fourteenth Amendment liability.  They cite two cases from this circuit for support: <u>Merrick v. Farmers Ins. Group</u>, 892 F.2d 1434, 1438 (9th Cir. 1990), and <u>Rodriguez v. John Muir Medical Center</u>, 2010 WL 3448567, at *7-*8 (N.D. Cal.), which relies on <u>Merrick</u>.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

In both these cases, the courts held that the plaintiff had to produce more than just an isolated derogatory comment by the defendant to support an inference of discriminatory intent on summary judgment.

Neither Merrick nor Rodriguez is analogous here because they specifically address workplace discrimination claims.  In that context, where the plaintiff has necessarily had a continuous employment relationship with the defendant, isolated comments offer only limited insight into the defendant's motives.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) (discussing the limited evidentiary value of "stray remarks in the workplace" in a Title VII disparate treatment case).  In contrast, Amagau's decision to arrest Valdez here was based on his brief interaction with Valdez moments before the arrest.  In the space of that brief interaction, Agamau's isolated comment is potentially quite probative of his underlying motives, especially since it remains disputed whether Agamau had probable cause to make the arrest.  See, e.g., Carroll v. Village of Homewood, 2001 WL 1467708, at *14 (N.D. Ill.) ("If there was no probable cause and [the defendant] indeed called [the plaintiff] a 'loud mouth nigger' upon his arrest (a disputed fact), this is sufficient to support an inference of discriminatory intent.").

Because the parties dispute whether Agamau actually made this comment to Valdez, Amagau is not entitled to summary judgment on Plaintiffs' equal protection claim.  All other individual Defendant officers, however, are entitled to summary judgment on this claim.

3.   Claims arising under § 1985 and the First, Fifth, Sixth, and Eighth Amendments

Defendants do not appear to have raised any arguments in support of their motion with respect to Plaintiffs' First, Fifth, Sixth, and Eighth Amendment claims or their § 1985 claim. Accordingly, they have not met their initial burden and summary judgment must be denied with respect to these claims. See Nissan, 210 F.3d at 1107. Although these claims remain to be tried, the Court notes that Plaintiffs have not, thus far, provided an evidentiary basis to support most of these claims.

C.   Federal Claims against Defendants Martin and Rickert

Plaintiffs have not provided any evidence that Martin or Rickert actually participated in their arrests. Still, they contend that Martin and Rickert are liable for failing to prevent the alleged constitutional violations committed by their fellow officers. Because Plaintiffs' evidence does not support an inference of liability under this failure-to-prevent theory, Martin and Rickert are entitled to summary judgment here.

The Ninth Circuit has recognized that a defendant may be held liable under § 1983 even if the defendant does not personally participate in committing an unconstitutional act. To establish liability under this theory, the plaintiff must show that the defendant "omit[s] to perform an act which he is legally required to do which causes the deprivation of the plaintiff's federally protected rights." Stevenson v. Koskey, 877 F.2d 1435, 1439 (9th Cir. 1989) (citing Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978)). Generally, a defendant will be liable for an omission under § 1983 "only when there is an extremely high degree

17

of culpability for inaction." <u>Lenard v. Argento</u>, 699 F.2d 874, 885 (7th Cir. 1983).

Plaintiffs have not provided sufficient evidence to support an inference of liability under this standard.  As the cases they cite illustrate, courts typically only impose § 1983 liability for an omission when dealing with a supervisor's "ratification of a subordinate's misconduct." <u>Stevenson</u>, 877 F.2d at 1439 n.6; <u>see also</u> <u>Beverly v. Morris</u>, 470 F.2d 1356, 1357 (5th Cir. 1972) (noting that the plaintiff's suit rested "on the theory that [the defendant] was negligent in failing to train properly the auxiliary officer, to supervise his patrol duties, and to provide a regular police officer on duty the night of the assault").  In the present case, Plaintiffs have not presented any evidence that Martin and Rickert held supervisory authority over the officers who actually arrested Plaintiffs.  Thus, it is unlikely that they can be held liable under § 1983 for failing to prevent their fellow officers' actions.

More importantly, Plaintiffs have failed to produce any evidence that Martin and Rickert were even capable of preventing their fellow officers' allegedly unconstitutional conduct.  Even assuming that Martin and Rickert had a clear legal duty to prevent their peers from arresting Plaintiffs -- and Plaintiffs have not pointed to any specific duty here -- they could only satisfy that duty if they <u>knew</u> that their fellow officers' conduct threatened Plaintiffs' constitutional rights.  Plaintiffs' evidence does not support such an inference here.

For instance, the mere allegation that "Rickert was with Orlando when Stubbs was arrested" does not, on its own, support an

**United States District Court**
For the Northern District of California

inference that Rickert knew that Orlando might lack probable cause for the arrest.  <u>See</u> Opp. Summ. J. 20.  According to Plaintiffs' own evidence, Orlando was the only officer to have had direct contact with Stubbs, which would have made it difficult, if not impossible, for any other officer to assess the constitutionality of his arrest decision.[5]  Stubbs Depo. 32:4-:21.  Plaintiffs' evidence similarly indicates that Martin was not able to assess the constitutionality of Wallace's decision to arrest Martinez. Martinez Depo. 62:2-:5.  According to Martinez's own deposition testimony, Martin was preoccupied at the time of the arrest because he was speaking to another individual.  <u>Id.</u> 62:2-:5, 65:12-:13.

Without producing any evidence that Rickert or Martin actually had the capacity to stop their fellow officers from making unconstitutional arrests, Plaintiffs cannot establish that these officers are liable for omissions under § 1983. Accordingly, Rickert and Martin are entitled to summary judgment on all of Plaintiffs' claims against them.

D.   Federal Claims against Defendants Panighetti and Perez

As noted above, Plaintiffs have not named Panighetti and Perez as defendants in this lawsuit.  If they wish to substitute

---

[5] It is not clear that Rickert was even present during Stubbs' arrest, as Plaintiffs contend in their brief.  None of Plaintiffs' evidence actually identifies Rickert as the second officer present during Stubbs' arrest and their complaint asserts only that he was present during Martinez's arrest.  <u>See</u> Compl. ¶ 57.  In any event, even accepting <u>arguendo</u> that Rickert was present during Stubbs' arrest, none of Plaintiffs' evidence indicates that Rickert actually had the capacity to assess the constitutionality of Orlando's conduct.

these officers for Doe Defendants, they must file and notice a motion for leave to amend their complaint.  Their delay in doing so will weigh against them.

    E.   Federal Claims against Municipal Defendants

    In addition to their claims against the individual arresting officers, Plaintiffs also assert claims for municipal liability against the City of San Jose and SJPD Chief Davis.

    "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."  Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citing Monell, 436 U.S. at 691). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  Id.

    A city may not be held vicariously liable for the unconstitutional acts of its employees on the basis of an employer-employee relationship with the tortfeasor.  Monell, 436 U.S. at 691-92.  The Ninth Circuit has held that Monell liability can be established in one of three ways.  Specifically, the plaintiff must prove (1) "that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" (2) "that the individual who committed the constitutional tort was an official with final policy-making authority;" or (3) "that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis

for it." <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1346-47 (9th Cir. 1992).

Here, Plaintiffs do not point to a specific written policy encouraging SJPD officers to make section 647(f) arrests without probable cause.  Nor do they point to any written policy encouraging SJPD officers to consider race when making these arrests.  Rather, Plaintiffs argue that there is such a widespread practice among SJPD officers of making racially motivated section 647(f) arrests without probable cause that it amounts, in effect, to an unwritten municipal policy.  Plaintiffs also contend that the City had knowledge of this practice but nevertheless failed to correct it in its training of SJPD officers.  These arguments are addressed below.

       1.    Fourth Amendment Claims under <u>Monell</u>

Plaintiffs allege that there is a widespread, unwritten practice among SJPD officers of arresting people under section 647(f) without probable cause in violation of the Fourth Amendment.  They argue that this practice effectively functions as SJPD's standard operating procedure for public intoxication arrests.

For support, Plaintiffs rely on various reports and documents obtained from SJPD, which allegedly show that SJPD officers often lack valid reasons for making section 647(f) arrests.  They point specifically to SJPD's "Pre-Booking Information Sheets," "Affidavits re Probable Cause and Bail Setting," and "Police Reports."  Declaration of Andrew V. Stearns, Exs. C & E.  These documents provide a space for officers to describe their reasons for making a public intoxication arrest.  Plaintiffs have

United States District Court
For the Northern District of California

21

United States District Court
For the Northern District of California

submitted more than two thousand of these documents -- all completed by SJPD officers between 2007 and 2010 -- as evidence that the department's officers routinely fail to identify a legitimate source of probable cause for their section 647(f) arrests.  See id.  Plaintiffs also provide an analysis of these documents by Jesica Giron, who reviewed 350 of the reports and concluded that "probable cause was lacking in 71.43%" of them. Declaration of Jesica Giron ¶ 1.  Giron asserts that her criteria for determining whether or not an officer had probable cause was "whether the officer included details as to why the person was a danger to themselves or others."  Id. ¶ 2.  According to Plaintiffs, Giron's analysis demonstrates that SJPD officers frequently arrest individuals who may be intoxicated but who do not show signs that they are "unable to exercise care" for themselves or others, as the statute requires.  See Cal. Penal Code § 647(f).  This analysis does not support an inference that SJPD's arrest practices systematically violate the Fourth Amendment.

Giron's analysis is limited for several reasons.  First, Giron fails to state whether the reports she reviewed constitute a representative cross-section of all SJPD reports for section 647(f) reports.  She does not explain how these reports were selected or why her analysis is limited to 350 reports when Plaintiffs had access to over a thousand other reports.  Second, Giron fails to identify her qualifications or explain her methodology.  In fact, her entire analysis is less than a hundred words long.  Third, and most importantly, her analysis rests on the faulty assumption that symptoms of intoxication alone can

never justify an officer's decision to arrest someone under section 647(f).  This assumption ignores the possibility that certain symptoms of intoxication can also provide an officer with reason to believe that someone is unable to care for him or herself.  Plaintiffs' own evidence includes several SJPD arrest reports featuring written observations of arrestee behavior that satisfy both criteria.  See, e.g., Stearns Decl., Ex. C, File 6, Affidavit of Probable Cause for C. Moreno, at 001327 (citing "poor balance" and "poor time/situational awareness" as evidence of both intoxication and inability to care for one's self).

In sum, Plaintiffs' evidence does not support an inference that SJPD officers follow a "standard operating procedure" or "longstanding practice" of systematically ignoring considerations that bear on probable cause under section 647(f).  Gillette, 979 F.2d at 1346.  The evidence is also insufficient to support an inference that any SJPD officer with "policy-making authority," such as Chief Davis, participated in making an unconstitutional arrest or "ratified" a subordinate's decision to do so.  Id.  Plaintiffs do not even appear to allege, let alone offer evidence, that the officers who arrested them had policy-making authority or consulted a supervisor before making the arrest.  Accordingly, municipal Defendants are entitled to summary judgment on Plaintiffs' Fourth Amendment claims under Monell.

2.   Fourteenth Amendment Claims under Monell

Plaintiffs allege that SJPD enforces section 647(f) in a racially discriminatory manner in violation of the Fourteenth Amendment.  Specifically, they contend that SJPD targets Latinos for public intoxication arrests so often that the practice

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

effectively functions as the department's standard operating procedure.[6]   To survive summary judgment on this claim, Plaintiffs must produce evidence to support an inference that SJPD maintained a policy, custom, or longstanding practice of intentionally discriminating against Latinos.  Navarro v. Block, 72 F.3d 712, 716 (9th Cir. 1995); Gillette, 979 F.2d at 1346.

Discriminatory intent may be proved by indirect evidence, including whether the challenged state action has a disproportionate "impact" on a particular group.  Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977).  The Supreme Court has cautioned, however, that "impact alone is not determinative" and, absent a clear pattern of discrimination, courts must look to other evidence when adjudicating equal protection claims.  Id.  The critical inquiry in assessing statistical evidence of discriminatory impact is "whether that impact is sufficiently gross or stark that a court must infer that it was intended by the defendant."  Gay v. Waiters' & Dairy Lunchmen's Union, 694 F.2d 531, 552 (9th Cir. 1982).  Cases where statistical evidence alone is sufficient to establish equal protection liability are rare.  Id. ("'Discriminatory impact,' as shown by statistical evidence, is a starting point, and an important starting point, to that inquiry, but is rarely sufficient of itself."); Arlington Heights, 429 U.S. at 266.

Here, Plaintiffs rely principally on statistical evidence to support their discrimination claim.  They provide an analysis by

---

[6] Although one of the four Plaintiffs in this suit is African-American, Plaintiffs' claims against municipal Defendants here are based solely on discrimination against Latinos.  2AC ¶ 119.

Ann Kalinowski which identifies a statistically significant[7] disparity between the proportion of San Jose's population that identifies as Latino (thirty-three percent) and the proportion of people arrested for public intoxication who are Latino (fifty-seven percent).  Declaration of Ann Kalinowski ¶¶ 8-9 (focusing on statistics for the year 2007).  Kalinowski's analysis also compares the rate at which Latinos were arrested for public intoxication in San Jose (eighty-five arrests per 10,000 Latinos) to their arrest rates in Oakland (forty-nine arrests per 10,000 Latinos) and San Diego (twenty-two arrests per 10,000 Latinos).  Id. ¶¶ 8, 13.  She concludes that, even when controlling for differences in these cities' Latino populations, Latinos were arrested for public intoxication at a much higher rate in San Jose.  Id.

In addition to Kalinowski's analysis, Plaintiffs provide data from a 2007 report[8] by the National Highway Transportation Safety Administration (NHTSA) which, they argue, further illustrates that the SJPD arrest disparities are the product of discriminatory animus.  Plaintiffs state that the NHTSA report indicates that the percentage of Latino drivers who drive at night without alcohol in their system is roughly comparable to the percentage of white

---

[7] $Z = 34.8$; P-value ≈ 0.  Kalinowski Decl. ¶ 9.

[8] Nat'l Transp. Safety Admin., National Roadside Survey of Alcohol and Drug Use: Alcohol Results (2007), available at http://www.nhtsa.gov/Driving+Safety/Research+&+Evaluation/2007+National+Roadside+Survey+of+Alcohol+and+Drug+Use+by+Drivers. Plaintiffs have asked the Court to take judicial notice of the report.  The Court will take judicial notice of the report but not for the truth of the matters asserted therein.

drivers who do so.[9]  Based on this statistic, Plaintiffs argue that "the percentage of Hispanics who are intoxicated while driving does not differ from the percent of Caucasians" and, thus, in the absence of discriminatory enforcement, the rates of public intoxication arrests between the two groups should be roughly equivalent.  Opp. Summ. J. 23.

None of this evidence is sufficient to support an inference of discriminatory intent on the part of SJPD.  The Kalinowski analysis falls far short of illustrating the "clear pattern" of discrimination "unexplainable on grounds other than race" that is required to establish equal protection liability based on statistical evidence.  Arlington Heights, 429 U.S. at 266. Kalinowski fails to explain, for instance, why San Jose's Latino population represents the appropriate baseline against which the Latino share of section 647(f) arrestees should be compared.  This decision ignores the possibility that some of SJPD's public intoxication arrests may involve individuals who reside outside of San Jose -- such as all four Plaintiffs in this case.[10]  To show a pattern of discriminatory enforcement, Plaintiffs would have to select a baseline that more accurately reflects the population of people potentially subject to section 647(f) arrests.  At the very least, Plaintiffs must explain why Kalinowski's choice of baseline is reasonable.  Cf. Johnson v. Northwest Airlines, 1995 WL 242001, at *3 (6th Cir.) (per curiam) (upholding summary judgment in favor

---

[9] Plaintiffs do not provide a citation to specific page of the report, which is over one hundred pages in length.

[10] Although Kalinowski states in her declaration that her conclusions would apply with equal force to the "San Jose census region," she fails to explain how she reached this conclusion.

United States District Court
For the Northern District of California

of Title VII defendants because "plaintiff gives us no reason why his baseline . . . provides the appropriate statistic" for assessing discriminatory impact).

Kalinowski's analysis suffers from other critical defects. It relies, for example, on second-hand data taken from a 2009 newspaper article and offers no guarantee of its accuracy. Kalinowski Decl. ¶ 8.  Furthermore, the analysis purports only to show that the discrepancy between the Latino share of San Jose's population and the Latino share of SJPD's public intoxication arrests is "not due to chance."  Id. ¶ 9.  The Ninth Circuit has held that this type of analysis is, without more, insufficient to demonstrate discriminatory intent.  Gay, 694 F.2d at 553 ("Simply put, statistics demonstrating that chance is not the more likely explanation are not by themselves sufficient to demonstrate that race is the more likely explanation for an employer's conduct [in a Title VII case].").

Kalinowski's comparison of section 647(f) arrest rates in San Jose, Oakland, and San Diego is similarly flawed.  At no point does Kalinowski explain why Oakland and San Diego are appropriate cities against which to compare San Jose's Latino arrest rate. Without this explanation -- and with no reference to statewide statistics -- the selection of these cities amounts to little more than statistical cherry-picking.

Plaintiffs' reliance on the NHTSA report is even more problematic.  Not only is the report based on the results of a national survey of nighttime drivers, which may or may not reflect the habits of San Jose-area drivers, but it says nothing about the drinking habits of non-drivers.  As Plaintiffs' own arrests in

this case demonstrate, non-drivers -- such as Vasquez, Martinez, and Stubbs -- can also be arrested under section 647(f). Plaintiffs' effort to extrapolate the rates of public intoxication among different racial groups in the San Jose area from a national survey of nighttime drivers is too strained to satisfy their burden on summary judgment.

Thus, in light of the numerous deficiencies in Plaintiffs' statistical evidence and their failure to produce any other evidence of discrimination,[11] municipal Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.  See Jok-ef v. Columbia Basin CLG, 66 F.3d 335, at *4 (9th Cir. 1995) (unpublished opinion) ("Statistical evidence by itself is not sufficient to avoid summary judgment unless such evidence reveals 'a clear pattern [of discrimination], unexplainable on grounds other than race.'" (citations omitted; alterations in original)).[12]

### 3.    Failure-to-Train Claims under Monell

The Supreme Court has recognized that, under "limited circumstances, a local government's decision not to train certain

---

[11] Although the comment that Agamau allegedly made to Valdez during his arrest constitutes non-statistical evidence of discrimination, it is insufficient on its own to support an inference of a widespread pattern of discrimination.

[12] In their motion for class certification, Plaintiffs refer to this suit as a "disparate impact" case and cite several cases where statistical evidence was used to show discriminatory impact. These cases are inapposite to Defendants' summary judgment motion. The cases Plaintiffs cite arise under civil rights statutes, such as Title VII and the Voting Rights Act, that expressly support liability for "disparate impact" and "discriminatory effect."  In contrast, Plaintiffs' claims here arise under the Equal Protection Clause, which the Supreme Court has long held does not support "racial impact" liability.  See Washington v. Davis, 426 U.S. 229, 247-48 (1976).

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

employees about their legal duty to avoid violating citizens'
rights may rise to the level of an official government policy for
purposes of § 1983." Connick, 131 S. Ct. at 1359.  To establish
liability under this theory, the "municipality's failure to train
its employees in a relevant respect must amount to 'deliberate
indifference to the rights of persons with whom the [untrained
employees] come into contact.'" Id. (citing Canton v. Harris,
489 U.S. 378, 388 (1989)).  This "stringent standard of fault"
requires proof that "policymakers are on actual or constructive
notice that a particular omission in their training program causes
city employees to violate citizens' constitutional rights."  131
S. Ct. at 1360.  In short, the training deficiency must be the
"functional equivalent of a decision by the city itself to violate
the Constitution." Id.  Plaintiffs have not met this standard
here.

    Defendants' evidence indicates that, since at least 2007,
SJPD has provided its officers with specific training in section
647(f) enforcement upon their graduation from the police academy.
See Declaration of Michael Knox ¶¶ 2-7.  Although Plaintiffs do
not dispute this evidence, they contend that SJPD's training
procedures were constitutionally deficient.  They further assert
that City policymakers should have known of this deficiency based
on a report by the City's Public Intoxication Task Force, which
was established in November 2008 to review SJPD's section 647(f)
enforcement policies.  Pls.' Request for Judicial Notice, Ex. K,
Memorandum Re: Public Intoxication Task Force, at 1.[13]  The task

_____

    [13] The Court grants Plaintiffs' request to take judicial
notice of this document.

force was created at the request of the City Council and charged with proposing policy recommendations to City officials. <u>Id.</u> It consisted of members of various community organizations and various City agencies, including SJPD. <u>Id.</u> The task force issued its recommendations in June 2009. <u>Id.</u>, Ex. L.

Plaintiffs' reliance on the task force and its report as evidence of the City's failure to train its officers is misplaced. The task force convened after all four Plaintiffs in this case were arrested and Plaintiffs have not identified any evidence that SJPD made any unconstitutional arrests after the task force issued its report. Moreover, the report itself could not have provided the City with notice that SJPD officers were routinely committing constitutional violations, as Plaintiffs suggest. The report focused principally on proposing procedural reforms and did not address the constitutional implications of past SJPD practices. <u>See id</u>. Although one of the task force's member organizations highlighted possible racial disparities in section 647(f) arrest rates, the report itself stated that these "observations have not been approved or validated by the [task force] or Administration." <u>Id.</u>

Accordingly, neither the creation of the task force nor its final report gave City officials "notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." <u>Connick</u>, 131 S. Ct. at 1360. Without this notice, the City cannot be held liable for failure to train its officers under <u>Monell</u>. Municipal Defendants are therefore entitled to summary judgment on this claim.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

F.   State Claims

Plaintiffs assert claims of false arrest and battery against Wallace, Agamau, Orlando, Rickert, and Martin.  In addition, they charge all Defendants with civil conspiracy, negligence, and violations of the Bane Act and the Ralph Act, Cal. Civ. Code §§ 52.1, 51.7.

Defendants contend that they are entitled to summary judgment on all of these claims because the officers who arrested Plaintiffs had probable cause to do so.  Plaintiffs, in response, argue that summary judgment on these claims must be denied because Defendants have not established probable cause.

As explained above, the parties dispute several facts that are central to determining whether or not Defendants had probable cause to arrest Plaintiffs under section 647(f).  Thus, because Defendants present no other arguments or evidence supporting their motion for summary judgment on Plaintiffs' state law claims, their motion must be denied with respect to these claims.  See Nissan, 210 F.3d at 1107.

II.  Plaintiffs' Motion for Class Certification

A.   Legal Standard

Plaintiffs seeking to represent a class must satisfy the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b).  Rule 23(a) provides that a case is appropriate for certification as a class action if

> (1)   the class is so numerous that joinder of all members is impracticable;
>
> (2)   there are questions of law or fact common to the class;

> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs must also establish that one of the subsections of Rule 23(b) is met.  In the instant case, Plaintiffs seek certification under subsections (b)(1) and (b)(2), or alternatively, under (b)(3).

Rule 23(b)(1) applies where the prosecution of separate actions by individual members of the class would create the risk of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class," or of adjudications "which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."  Fed. R. Civ. P. 23(b)(1).

Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. Proc. 23(b)(2).  "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) actions.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997).

Rule 23(b)(3) permits certification where common questions of law and fact "predominate over any questions affecting only individual members" and class resolution is "superior to other

available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are intended "to cover cases 'in which a class action would achieve economies of time, effort, and expense . . . without sacrificing procedural fairness or bringing about other undesirable results.'" Amchem Prods., 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3) Adv. Comm. Notes to 1966 Amendment).

Regardless of what type of class the plaintiff seeks to certify, it must demonstrate that each element of Rule 23 is satisfied; a district court may certify a class only if it determines that the plaintiff has borne this burden. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158-61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977). In general, the court must take the substantive allegations of the complaint as true. Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975). However, the court must conduct a "'rigorous analysis,'" which may require it "'to probe behind the pleadings before coming to rest on the certification question.'" Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quoting Falcon, 457 U.S. at 160-61). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." Dukes, 131 S. Ct. at 2551. To satisfy itself that class certification is proper, the court may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties. Blackie, 524 F.2d at 901 n.17. "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.'" Aburto

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

v. Verizon Cal., Inc., 2012 WL 10381, at *2 (C.D. Cal.) (quoting Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011)).  Ultimately, it is in the district court's discretion whether a class should be certified.  Molski v. Gleich, 318 F.3d 937, 946 (9th Cir. 2003); Burkhalter Travel Agency v. MacFarms Int'l, Inc., 141 F.R.D. 144, 152 (N.D. Cal. 1991).

    B.   Analysis

    Defendants contend that class certification must be denied here because Plaintiffs have failed to satisfy the commonality prerequisite of Rule 23(a)(2).

    The Supreme Court recently held in Dukes that plaintiffs seeking to certify a Title VII class action must produce "'significant proof' that [the defendant] 'operated under a general policy of discrimination'" to satisfy the commonality prerequisite.  131 S. Ct. at 2253 (citations omitted) (emphasis added).  Since Dukes, lower courts have applied this rule to plaintiffs in Fourth and Fourteenth Amendment class actions, as well, by requiring them to produce "significant proof" that the defendant followed an unconstitutional policy or practice.  See, e.g., Aguilar v. Immigration & Customs Enforcement Div., 2012 WL 1344417, at *5-*7 (S.D.N.Y.) (denying class certification under Dukes because plaintiffs failed to establish that the defendant immigration agency followed an unconstitutional policy of targeting Latinos for home raids).  In the absence of such proof, courts have denied certification for lack of commonality.  See id.

    As explained above, Plaintiffs here have failed to produce sufficient evidence to establish that SJPD followed any unconstitutional policy or practice regarding public intoxication

34

**United States District Court**
For the Northern District of California

arrests.  Specifically, they have not shown that SJPD's training procedures resulted in widespread constitutional violations nor have they provided reliable evidence showing a widespread practice of unreasonable seizures or racially discriminatory enforcement of section 647(f).

Indeed, even if Plaintiffs' evidence did not suffer from the numerous deficiencies described above, it would still likely fall short of satisfying Rule 23(a)'s commonality requirement because it rests on five year old data.  Earlier this year, a court in the Southern District of New York denied class certification on this basis to plaintiffs alleging that federal immigration agents unconstitutionally target Latinos for home raids.  Aguilar, 2012 WL 1344417, at *7.  The court found that the plaintiffs' statistical analysis of five year old data lacked the "scientific rigor" that Dukes required and could not be used to certify a class that included plaintiffs whose homes were raided years later.  Id. ("Plaintiffs' statistical analysis is based on lists of targets for the 2007 operations.  It is, as in [Dukes], standing alone, insufficient to provide a foundation for a determination that ICE agents today engage or would engage in intentional targeting of Latinos for unconstitutional home raids.").  Plaintiffs' statistical analysis of 2007 arrest rates suffers from the same problem.

Accordingly, because Plaintiffs have failed to show that SJPD followed an unconstitutional practice or policy, they cannot demonstrate commonality under Rule 23(a)(2).  In light of this failure, the Court need not address whether Plaintiffs have satisfied the requirements of Rule 23(b).

CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Docket No. 127) is GRANTED in part and DENIED in part. Plaintiffs' motion for class certification is DENIED (Docket No. 118). Defendants' administrative motion to accept their late filings (Docket No. 154) is GRANTED. Defendants' evidentiary objections to the declarations of Jesica Giron and Ann Kalinowski are overruled as moot.

Defendants are granted summary judgment on Plaintiffs' first, second, third, fourth, and fifth causes of action. Defendants are also granted summary judgment on Stubbs' and Martinez's Fourteenth Amendment claims, which are asserted in Count Six of Plaintiffs' sixth cause of action. Defendants City of San Jose, Chief Davis, Officer Rickert, and Officer Martin are entitled to summary judgment on all claims against them. Plaintiffs' other causes of action remain to be tried.

The parties are referred to Magistrate Judge Grewal for a settlement conference.

Within seven days of this order, the parties will submit a joint statement proposing dates for a final pretrial conference and a jury trial. The final pretrial conference must be scheduled for a Wednesday at 2:00 p.m. and take place at least two weeks before trial is set to begin.

IT IS SO ORDERED.

Dated: 2/27/2013

CLAUDIA WILKEN
United States District Judge